**Merchants Loan & Trust Company, Executor of the Will of Patrick Sexton, Deceased, Appellant, v. Dominick Egan, Executor of the Will of Thaddeus J. Butler, Deceased, Appellee.**

### Gen. No. 11,726.

1. Finding of court—*effect given to*. The findings of a court as to the facts in a case where it is tried without a jury, are entitled to the same presumptions as the verdict of a jury.

2. Evidence—*what does not render competent, witness otherwise incompetent by virtue of interest*. The fact that a witness was called by the adverse party in a proceeding had under section 81 of the Administration Act does not qualify such witness (who is a party in interest) as competent in his own behalf in an action subsequently instituted by such adverse party with respect to the same subject-matter, such adverse party suing in a representative capacity.

3. Donor and donee—*when gift not established*. *Held*, that the evidence in this case did not establish a gift.

4. Practice—*when judgment may be entered nunc pro tunc.*

Merchants Loan & Trust Co. v. Egan, 143 App. 572.

If after a cause has been heard by the court the defendant therein dies, it is proper for the court to enter judgment against him *nunc pro tunc* as of a date prior to the death of such defendant.

Trover. Appeal from the Circuit Court of Cook county; the Hon. HENRY B. WILLIS, Judge, presiding. Heard in this court at the March term, 1907. Affirmed. Opinion filed October 16, 1905.

[Note: Originally, the court directed the ensuing opinion "not to be reported," but later sent it to the reporters to be incorporated as follows.]

W. J. HYNES, J. B. LONGWORTHY and McCULLOCH & McCULLOCH, for appellant.

A valid gift is shown when it appears that the donor expressed an intention to give, and in pursuance thereof, placed it in the power of the intended donee to take possession of the thing intended to be given. Scott v. Berkshire County Savings Bank, 140 Mass. 157; McElroy v. National Savings Bank, 40 N. Y. S. 340; *In re* Wachter's Estate, 38 N. Y. S. 941; Scrivens v. North Eastern Savings Bank (S. C. Mass.), 44 N. E. Rep. 251; Eastman v. Woronoco County Savings Bank, 136 Mass. 208; Gerrish v. New Bedford Institution For Saving, 128 Mass. 159; Alger v. North End Savings Bank (S. C. Mass.), 15 N. E. Rept. 916; Corle v. Monkhouse (S. C. N. J.), 25 Atl. Rept. 157; Hackett v. Moxley (S. C. Vt.), 25 Atl. Rept. 898; Pink v. Church, 14 N. Y. S. 337; Harris v. Hopkins, 43 Mich. 272; Trow v. Shannon, 78 N. Y. 446, etc.; Porter v. Gardner, 15 N. Y. S. 398; Hunter v. Hunter, 19 Barbour, 631; Herr's Appeal, 5 Watts & Sergeant's Reports, 498; Grangiac v. Arden, 10 Johnson (N. Y. C. L.), 293; Cooper v. Burr, 45 Barbour, 9; Penfield v. Thayer, 2 E. D. Smith, 305; Bennett v. Cook, 28 S. C. 353; Caldwell v. Wilson, 22 S. C. 63; Blake v. Jones, Bailey's Eq. Rep. (6 S. C. Eq.), 136; Banks v. Hatton, 1 Nott & McCord 221; Reid v. Colcock, 1 Nott & McCord 527; *In re* Parker's Estate, 34 Weekly Notes of Cases, 376; Stephenson's Admr. v. King et al., 81 Ky. 425; Martin

v. Martin, 170 Ill. 18; Hagemann v. Hagemann, 90 Ill.
App. 251; Hagemann v. Hagemann, 102 Ill. App. 479;
Hagemann v. Hagemann, 204 Ill. 378.

A valid delivery of the thing given does not require
that the donor place it beyond his power of repossession. Porter v. Gardner, 15 N. Y. S. 398; Cooper v.
Burr, 45 Barbour 9.

A sufficient delivery is accomplished if the donor,
pursuant to the intent to give, so places the object that
the donee may take possession without committing a
trespass. Blake v. Jones, Bailey's Equity 136; *In re*
Parker's Estate, 34 Weekly Notes 376.

Declarations of the donor that he had made a gift
are sufficient evidence upon which to found a valid
delivery. Harris v. Hopkins, 43 Mich. 272; Trow v.
Shannon, 78 N. Y. 446; Porter v. Gardner, 15 N. Y.
S. 398; Grangiac v. Arden, 10 Johnson, 293; Bennett v.
Cook, 28 S. C. 353; Blake v. Jones, Bailey's Eq. 136.

When one party to an action sues or defends as executor or administrator the other party cannot testify
of his own motion as to matters occurring during the
life of the deceased. But if such party be called by
such executor or administrator, and examined as to
matters which occurred during the life of the deceased
objection as to the competency of such party is entirely waived. Smith's Appeal, 52 Mich. 415; Niccolls
v. Esterly, 16 Kan. 32; Watkins v. Hughes, 56 Atl.
Rep. 22; Young v. Montgomery, 67 N. E. Rep. 684;
*In re* Woodbury's Estate, 81 N. Y. S. 503; Tucker v.
Gentry, 67 S. W. Rep. 723.

If, where a party is incompetent to testify of his
own motion, the other party elects to call him the
whole testimony so elicited must be considered. The
party eliciting such testimony cannot accept a portion
and reject the balance. Niccolls v. Esterly, 16 Kan. 32;
Moore v. Wright, 90 Ill. 470; Young v. Montgomery,
67 N. E. Rep. 684.

Section 42 of the Practice Act contemplates that in
the decision of the case, the court shall apply the prop-

ositions that he marks "held;" and if the court fails to apply a correct proposition applicable to the case, the error is not cured by marking it "held." Sec. 42, chap. 110, S. and C. Revised Statutes; Carlyle Water, Light & Power Co. v. Carlyle, 31 Ill. App. 325; Allman v. Lumsden, 159 Ill. 219.

Where a sole defendant dies before final judgment, and his executor appears, suggests the death, and moves to be substituted, it is error to deny such motion and enter judgment *nunc pro tunc* against the deceased. Sec. 11, chap. 1, Starr & Curtis Rev. Stat.; Life Ass'n of America v. Fassett, 102 Ill. 315; Claflin v. Dunne, 129 Ill. 241; Danforth v. Danforth, 111 Ill. 236.

Where evidence is introduced as to a conversation, at which a writing was introduced and discussed between the parties, the writing is relevant and admissible in evidence, as a part of the conversation. Greenleaf on Evidence, vol. I, sec. 108; Wharton on Evidence, vol. I, sec. 259; Stephen's Digest of Evidence, chap. 2, art. 7; Carter v. Carter, 152 Ill. 434.

T. A. MORAN, for appellee.

There can be no gift of personal property unless the contract of gift is executed. Delivery of the subject-matter of the gift is of the essence of the title. There was no delivery of the bonds in controversy in this case. Telford v. Patton, 144 Ill. 620; Grover v. Grover, 24 Pickering 261; Wilson v. Keller, 9 Ill. App. 347; Chambers v. McCreery, 106 Fed. Rep. 364.

It is essential, in order to constitute a gift, that the gift be absolute and irrevocable; that the giver part with all present and future dominion over the property given; that the gift go into effect at once, and not at some future time; that there be a delivery of the thing given to the donee, and that there be such a change of possession as to put it out of the power of the giver to repossess himself of the thing given.

Barnum v. Reed, 136 Ill. 388; Williams v. Chamberlain, 165 Ill. 210 (on page 218); Trimmer v. Danby, 25 Law Journal Rep. U. S. 424; In the Matter of Crawford, 113 N. Y. 560; Beaver v. Beaver, 117 N. Y. 421; Young v. Young, 18 N. Y. 421; Keepers v. Fidelity Title & Trust Co., 23 L. R. A. 184; Roberts v. Draper, 18 Ill. App. 167.

The delivery of the gift must take place at the time the gift is made. An after-acquired possession of the donee is nothing, and a previous and continuous possession thereof by authority of the donor is no better. Miller *et ux* v. Jeffries, 4 Grat. (Va.) 472; Cutting v. Gilman, 41 N. H. 147.

It is essential to delivery that there be an intention on the part of the donor that the gift take immediate effect. Richardson v. Richardson, 148 Ill. 563.

But mere intention without action sufficient to constitute delivery will not establish a gift. Barnum v. Reed, 136 Ill. 388; Williams v. Chamberlain, 165 Ill. 210; McCarthy v. Ridgway, 160 Ill. 156; Telford v. Patton, 144 Ill. 611; Schults v. Schults, 159 Ill. 654.

Where title to property is claimed by way of gift, the burden of proof is on the one claiming the gift. Selleck v. Selleck, 107 Ill. 389; Boudreau v. Boudreau, 45 Ill. 480; Grey v. Grey, 47 N. Y. 552, on page 556; *In re* Wiegel's Estate, 28 N. Y. Supp. 95; Smith, Admr., v. Dorsey, 38 Ind. 451; Bullock v. Kinnon, 6 Am. Dec. 562.

The bonds in question being the property of the decedent, upon his death become assets of his estate. Bigelow, Admr., v. Patton, 4 Mich. 170; Sterling v. Wilkinson (Va.), 3 S. E. Rep. 533.

Statements by one that he has made a gift of a personal title are not competent to prove the gift. Wheatley v. Abbott, 32 Miss. 343; Spencer v. Vance, 57 Mo. 427; Rockwood v. Wiggin, 82 Mass. 402, page 403; Delmotte v. Taylor, 1 Redfield Surrogate Rep. 419.

1st. No trust was created by the acts and words of Butler, deceased, because no *cestui que trust* is shown.

Sexton expressly refused to say what the secret and sacred purpose for which he received the bonds, was. Gilman v. McArdle, N. Y. Sup. Repts (Jones & Spencer), p. 463.

2nd. Because a trust of personal property cannot be constituted without a delivery of the personal property, any more than a gift can be made without a delivery of the personal property.

3rd. The value of the promissory note converted, is presumed to be the face value with interest from the time of conversion to the date of trial. American Express Co. v. Parsons, 44 Ill. 312; Union Trust Company v. Rigdon, 93 Ill. 458, 470; Hayes v. Life Ins. Co., 125 Ill. 626; Olds v. Chicago Board of Trade, 33 Ill. App. 445.

Mr. Presiding Justice Adams delivered the opinion of the court.

The appellee sued Patrick J. Sexton, who died pending the trial, and whose executor was substituted as defendant, in trover, for certain bonds of the face value of $29,000, and a promissory note made by John Ireland, payable to the order of Thaddeus J. Butler, for the sum of $5,000. The defendant pleaded not guilty, and by agreement between the parties a jury was waived and the cause was submitted to the court for trial. The court found for the plaintiff and assessed the plaintiff's damages at the sum of $34,372.52, and rendered judgment on the finding.

The claim of Sexton is, that Dr. Butler, shortly before his death, gave him the bonds and note.

Thaddeus J. Butler was a priest of the Roman Catholic Church, and officiated as such in the city of Chicago prior to his death. June 23, 1897, he left Chicago to go to Rome, Italy, expecting to be there consecrated as Bishop of Concordia, Kansas. He died at Rome, July 16, 1897, leaving a will. The will is dated June 23, 1897, the day the testator left Chicago for Rome. By the will the following bequests were made: To the

testator's brother, Patrick T. Butler, $5,000; to Miss
Nellie Cunningham $1,000; to the testator's brother,
Francis J. Butler, $1,000, or £200, in case he should
survive the testator; to Rev. Dominick Egan, $2,000, to
be expended for masses for the repose of the testa-
tor's soul; to Archbishop P. A. Feehan $3,000, for the
use of the Church of St. James, Rockford, Illinois, of
which testator was formerly pastor.   The will con-
cludes as follows:  ''The rest, residue and remainder
of all my real and personal estate I give, demise and
bequeath the same unto the Rev. Dominick Egan of
St. Stephen's Church, Chicago, my very dear and
trusted friend.  I hereby appoint the said Rev. Domi-
nick Egan executor of this, my will, and ask that no
bonds be required of him.''

It appears from the evidence that the will, at the
time of the testator's death, was in a vault in the
Rookery building, in the city of Chicago, and that
Miss Margaret McNamara, who was the testator's
housekeeper, had custody of the will, and informed
appellee that he was appointed executor, and gave him
the will.   The testator, February 25, 1895, rented box
2410 from the National Safety Deposit Co., which box
was in the vaults of the First National Bank building
in Chicago, and which, within a couple of days, was
exchanged for box 5294.   This box was leased to But-
ler in his own name, and P. J. Sexton was named as
deputy.   June 24, 1896, the lease, by Dr. Butler's re-
quest, was changed to run to him and Sexton as joint
lessees.  Dr. Butler had a key to the box after the
lease was changed, which he had when he left Chicago
for Rome, June 23, 1897.   Sexton testified that he had
a key to the box in March, 1897.   Sexton had a box of
his own in another safety vault, and the testator had
other boxes in other vaults.   It does not appear from
the evidence that Sexton ever kept or had any of his
own papers or documents in box 5294.   On the con-
trary, it appears that the only papers and documents
therein were the property of the testator.

· Sexton testified that he was at the box once, in March, 1897, with Dr. Butler, and there is no evidence that he opened it at any time until after Dr. Butler's death; and Mr. McHugh, who acted as attorney for the executor, testified that Sexton told him that he had never been to the box, or opened it, until after Dr. Butler's death.

Sexton testified that July 19, 1897, the third day after Dr. Butler's death, he went to the box and opened it and found therein a large envelope marked "Instructions," in Dr. Butler's handwriting; that there was in the envelope some correspondence between Dr. Butler and Archbishop Ireland, and a note of the latter for $5,000, with interest at the rate of six per cent; that there was written on the envelope: "Friend P. J. Sexton: Destroy this correspondence in the event of my death" and "no" $5,000 in figures below. He also found in the box another large envelope, which he said had apparently contained some securities, on the back of which were memoranda scratched repeatedly both ways, and that he had no special recollection as to the memoranda. He also found in the box $15,000 in Santa Fe bonds, which he thinks were for $1,000 each, but there may have been a few $500 bonds; that he burned everything in the box except the bonds within a week or two after he opened the box, having become satisfied that it was his duty so to do, but refers only to the instruction, "Destroy this correspondence," etc., and testified that he had no special instructions and no instruction except to destroy the correspondence. He further testified that he had other bonds coming from Dr. Butler, which he received from a Mr. Kenna, after Dr. Butler left for Rome, which were delivered to him by Kenna, by Dr. Butler's direction to Kenna, and which, at the time he testified in the Probate Court, were in his own box in the Cosmopolitan Safety vault. The bonds and note above mentioned are those described in the declaration. "The findings of the court as to the facts

in a case, where it is tried without a jury, are entitled to the same presumptions as the verdict of a jury" (Fisk v. Hopping, 169 Ill. 105), and the well established rule is that the verdict of a jury will not be set aside as being contrary to the evidence, unless it is manifestly so. The evidence, which we have carefully read, is very voluminous, and we might merely state our conclusion as to whether the finding of the court is or not manifestly against the weight of the evidence; but, in view of the importance of the case, we will refer to the evidence as briefly as may be, and will first consider the evidence for appellee.

P. J. McHugh, the attorney who attended to the probating of the will of Dr. Butler, testified that about August 9th or 10th, 1897, he called on Sexton at his office in the First National Bank building, and told Sexton that he was about to present the will, and wanted to know the value of certain bonds and assets which he understood were in the box, so that he could fix values in the petition, and Sexton said, "Yes; there are bonds; come down and take a list of them," when witness told him he was in a hurry and asked him to kindly give him a list of the bonds, and Sexton then gave him a statement that the amount of the bonds was $29,000, $6,000 Frisco bonds and the remainder Atchison, Santa Fe bonds, and promised to send witness a list that day. Egan, the executor, was present at the interview, and the witness testified that after Sexton had invited him to go down and see the bonds, he, Sexton, said "As soon as the reverend gentleman is appointed," or "As soon as he is qualified I shall deliver the bonds to him. I make no claim on them. I have no claim on them." I would not be positive which expression he used. Sexton, at the same interview, said he thought it his duty to destroy the Ireland note; that on the back of the envelope were the words "Destroy this correspondence," and witness told him that he ought to be cautious; that it would be a very violent construction of those words to apply

them to a destruction of property, in which view Egan concurred; that Sexton told witness that he had never been to the box until after Dr. Butler's death; that when witness and Father Egan were about to leave, Sexton came close to witness and suggested that there should be a meeting of the friends and the estate settled without reference to the will, to which suggestion witness replied that probably he, Sexton, did not understand that suppressing a will was a serious offense, incurring severe punishment. In a second interview between witness and Sexton, which occurred at Sexton's office, at his request, in the afternoon of the day in which the above mentioned interview was had, Sexton told witness that he had to go to Cincinnati, and was writing a letter to witness which was partly written, and which he read and handed to witness to read and which witness read. In the letter was a list and the amount of the bonds was stated to be $29,000, and the letter also stated Sexton's belief that Dr. Butler wanted him to destroy the Ireland note. Sexton said he would go to Cincinnati that night and would return in a day or two and finish the letter. The next morning witness received this telegram from him from Cincinnati: "Treat all matters discussed as confidential until I return." Next saw him at his office about the 16th or 17th of July, and said to him, "You did not send me that letter that you promised to send me with a list of the bonds," and he said, "My dear fellow, I sought the light and I found the light. Those bonds are no concern of yours or of the reverend gentlemen." The appellee next put in and read in evidence, as an admission of Sexton, a proven transcript of the shorthand notes of Sexton's evidence in the Probate Court. It appears from the evidence that after demand made on Sexton by the executor to produce the bonds and note in question, and his refusal so to do, he was cited to appear before the Probate Court, under section 81 of chapter 3 of the Statutes, and appeared and was examined. His testimony then given is that contained

in the transcript. Counsel for appellee read parts of the transcript, saying he had no objection to the reading of the remainder, and counsel for appellant read what appellee's counsel omitted to read. We have read this evidence in the record, on account of the suggestion of appellee's counsel that thereby we would have a better understanding of it than by reading the abstract. The examination occurred in October, 1897. The first part of the evidence read from the transcript is in reference to the contents of the box in the First National Bank building, and what Sexton did as to such contents, and has been heretofore stated. He further testified, in substance, that in March, 1897, Dr. Butler said to him: "Now, I want to make some little different arrangement, and you will find in my box, in case of my death, certain envelopes which will be marked with the names of the owners, which I wish you to distribute to the proper persons. I intend to convey by will sufficient to comply with certain legal requirements, and I want you to arrange the balance, and I will place in this box certain envelopes, which you will distribute in case of my death." The witness further testified that in the last interview he had with Dr. Butler "He told me that he had found, on consulting a lawyer, that he could not dispose of the box in the way he had contemplated, and that he was going abroad. He had been unwell and might not return, and he found he had to dispose of, by will, everything he had possessed, if he proposed to distribute anything outside of the will. If he did, he would have to disposses himself absolutely. That was the only way he could arrange the matter as he wanted to. He said that he didn't want to make an exhibit in court of a lot of property. It might cause comment, and consequently he had made other arrangements. He wanted to make me a present of the bonds which would come from Mr. Kenna, and he wanted, in case of his death, he wanted to make me a present of the contents of the box. I said something more; I have

forgotten what it was, but I said 'Very well, if you want it that way, very well.' That was all the interview.'' In reference to the Kenna bonds the witness testified: ''The only thing he said about the bonds, in addition to what he told me, was, Mr. Kenna having purchased the bonds for him, he said, Mr. Kenna had .advised that when $6,000 had reached 90 they would be sold, but I could use my own judgment as to that.'' On cross-examination by his counsel, witness was asked to state fully what was said in his final talk with Dr. Butler, and answered: ''Well, he said he had made all his disposition. His will was completed, and that all his disposition was made, and that he had arranged matters as he desired to have them, and I would get from Mr. Kenna, by his order, $14,000 and he wanted to present me with the contents of the box in the event of his dying.'' The witness admitted that he had promised McHugh and Father Egan, not specially, but in a general way, to give them the information that they were seeking; that he sent from Cincinnati the telegram testified to by McHugh; that McHugh asked him, on his return from Cincinnati, for a list of the bonds, and that he refused it, using the language about having sought and found light, and saying to McHugh he had nothing to do with witness' affairs, but says they were talking about the note when he used the language about the light. He also admitted that he gave McHugh a statement of the amount of the bonds in question; also that he had no instructions except that which he found on the envelope to destroy the correspondence. He said that, when he opened the box he expected to find instructions, and that he had doubt as to what he should do with the note, and sought McHugh's advice, as a friend in regard to it. He denied having promised to turn over the bonds to the executor, and denied that he promised to give to McHugh a list of the bonds. Witness further testified that he said to McHugh, substantially, ''These are the bonds that Father Butler gave to me.''

Dominick Egan, the executor, testified that July 19, 1897, he met Sexton in his office, who told him that Dr. Butler and he held a box jointly, in which Dr. Butler had placed a lot of bonds and had told him, Sexton, in the event of his death to employ these bonds to some object or purpose, but he, Sexton, had forgotten what the purpose or object was; that Sexton spoke of an envelope containing the note of Archbishop Ireland and instructions to destroy the correspondence, and said he was in doubt whether the instructions included the note, and showed witness the envelope, and witness read the directions, when Sexton asked him what he thought, and he said he did not think the directions included the note; that August 10th witness and McHugh went to Sexton's office, and McHugh told Sexton he was going to probate the will, and that it was necessary to return to the Probate Court an estimate of the amount of the estate, and asked Sexton if he was willing to deliver up the bonds. He said he was, but that witness had threatened him with an order of court, etc. On it being explained to him that no threat was intended, that the order mentioned was a mere preliminary order to examine the contents of the safes belonging to the estate, he came round to witness and said he was not a man to be moved by threats, but, when treated gently, would do what was right, and that he would turn over the bonds to any legally authorized executor. McHugh, at the same interview, asked Sexton the value of the bonds, and witness thinks he said $25,000. It appears from the evidence of Sexton, when called on his own behalf, that he first stated the amount to be $25,000, but subsequently changed it to $29,000.

The witness Egan further testified that, in an interview with Sexton, July 28, 1897, Sexton complained of witness' position about the destruction of the note, and witness said to him that in matters of that kind regard must be had to the authority of the law, when Sexton said "that in matters of secret trusts the law

allowed considerable liberty or latitude, and he referred to some instances in his own experience in which he said he had defied the law." Evidence was introduced identifying the bonds as those described in the declaration.

We will next refer to the testimony of the witnesses for appellant's testator, Sexton. It appears from the testimony of Daniel Peckham, superintendent of the First National Bank vaults, that in March, 1897, Dr. Butler went to the bank building to renew the lease of box 5294, and that, in renewing it the clerk, by mistake, renewed it in Dr. Butler's name only, which, when Dr. Butler discovered, he returned to the building a little excited, and witness changed the lease to a joint one, as it was before. The witness testified that, at the time the mistake was corrected, he said to Dr. Butler: "You know that way would give Mr. Sexton the right to this property, this box, without any question," and Dr. Butler said, "Well, it is his property now; I am going to Europe," and witness said: "Mr. Sexton could take anything that was in the box," and he said, "That is what I want, that is his property." This conversation could not have occurred later than March 11, 1897, because the witness, on cross-examination, testified: "I saw Dr. Butler last on the 11th of March, 1897." But Sexton, in his testimony before the Probate Court, testified that it was in March, 1897, that he went with Dr. Butler to the box, and that the latter told him he would find in the box envelopes containing securities, with the names of the owners marked, which he wished him to distribute in case of his death. Besides, Sexton himself did not claim, nor do his counsel, in their argument claim, that the bonds and note in question were given to Sexton prior to June 23, 1897, the day Dr. Butler left Chicago for Rome. The lease was changed to a joint one June 24, 1896, and it seems singular, to say the least, that the witness should have delayed till March, 1897, to explain the effect of the change to Dr. Butler. If Dr. Butler made the

statements testified to by the witness, he probably did so to check explanations which he deemed officious and uncalled for.

Patrick J. Goslin, whose religious name is Brother Adjutor, testified, in substance, that he was well acquainted with Dr. Butler, and in 1893 or 1894 the Doctor gave him $35,000, in respect to which there was a declaration of trust in writing, Sexton being one of the trustees; that, about the beginning of 1896, Dr. Butler told him he was averse to dying possessed of much money, and was going to give considerable of his money to Sexton, and showed him three or four envelopes and said they were to be given to Sexton after his death. Later he told witness that this manner of disposal would not do, that he had to entirely dispossess himself of the property, and said, ''to the best of my recollection, that he had delivered these things to Sexton. That was the conversation, the substance. The exact words I cannot remember—and had consummated what he intended to do, and dispossessed himself of it.'' On cross-examination the witness fixes the time of the last mentioned conversation as about six months before Dr. Butler's death, or about December 1896, or January, 1897, being long before June 23, 1897, the date of the alleged gift. Witness further testified that three months later Dr. Butler told him he had fixed the matter. On cross-examination the witness testified that, after the second trial (by which he means the trial before Judge Hanecy, on appeal from the Probate Court) he told Brother Pious, his secretary, that he, witness, thought, from conversations he had with Dr. Butler, that he intended to give the bonds to Sexton, and ''that whatever he gave him was for a secret and sacred purpose.'' This witness manifested great interest in favor of Sexton, as appears from his testimony. He received from his secretary and read the evidence given before Judge Hanecy on the appeal from the Probate Court, before he testified in the present case.

Michael O'Brien, a Catholic priest, after testifying, generally, to intimate relations between Dr. Butler and Sexton, testified that in the winter of 1897, Dr. Butler, when he was sick in Mercy Hospital, said to him, "I have remembered Mr. Sexton if anything happens to me." This must have been in January or February, 1897, as Dr. Butler left for Rome June 23, 1897. Therefore, the language testified to could not have referred to the alleged gift of June 23, 1897.

James C. Burke testified that just before Dr. Butler went to Europe he went to him to procure a loan, and Dr. Butler told him that he was going away and had arranged his matters, and disposed of everything he had, and had made a will and some bequests, and that everything in Sexton's possession belonged to him. How long before Dr. Butler left Chicago for Europe the conversation testified to by this witness occurred, does not appear. The examination of Sexton, on his own behalf, in the Circuit Court, occupies over eighty pages of the abstract. Much of it, however, consists of questions ruled against on objection. He admits asking the advice of McHugh and Egan as to whether the instructions to destroy included the note and their opinion that they did not, also that he stated to McHugh that the amount of the bonds was $29,000, but denies that he promised a list of the bonds, or that he said he would turn them over to the executor, or that he said he had or made no claim on them, or that he said anything to Egan about a secret trust or the law in such case, as testified to by Egan. In respect to his knowledge of what the amount of the bonds was wanted for he testified: "I do not know whether or not McHugh told me he was getting the amount of these bonds for the purpose of putting it in a petition. I would not say that he did not say so." The following occurred in his examination: Q. "Didn't you print a statement, and submit it to Father Bart, in which you described your possession of these bonds as a secret and sacred trust?" A. "No. To my best

recollection I never described it as a secret and sacred trust. When I said to Father Egan in the room, that he recognized Brother Adjutor's trust and would not treat me in the same way, I meant that he had certain confidences to carry out, and I should be permitted to carry out confidences also. You will never know what confidence there was in my getting a present of these bonds. I will not tell you. Everything between Dr. Butler and myself is confidential. There was a confidence in that. I won't tell what the confidence was." Q. "What confidence was it?" A. "I won't tell." The Court: "I think you had better tell him, Mr. Sexton." A. "I cannot state. That is between my God and myself. I swore that those bonds were my property. They were given to me as my property, and I claim them now. We had confidential relations, and Dr. Butler knew what I would do with them. That is all the answer I will make to that question," etc. The witness further testified on cross-examination that, in his testimony in the Probate Court in relation to Dr. Butler making him a present of the bonds in the box, he did not say "in case of his death," that he said, "in contemplation of his death," although in his examination in chief, by his counsel, he admitted when his answer was read to him, in which he used the words "in case of my death," that he so answered, and also stated when asked by his counsel in the Probate Court to state fully the final talk with Dr. Butler, that Dr. Butler used the words, "in the event of his dying" in speaking of the alleged gift. The witness after a lengthy cross-examination as to what caused him to make a change to the words "in contemplation of death," marked by evasive answers, finally admitted that his attorney had called his attention to the words and suggested that there was a mistake.

Samuel T. Jacobs testified that, while he was secretary for the Chicago Brick Co., of which Mr. Sexton was president, he was in Sexton's office, when McHugh and Egan came there; that he was about three

or four feet distant from Sexton; that McHugh said he understood that there had been some difficulty between Sexton and Egan about some note, and Sexton said he had told Egan about the note, thinking he knew all about it, but found he knew nothing, and that was the end of it. McHugh said he understood there were some securities in the box, and Sexton said that was none of his affair, and McHugh said that remained to be seen, when Sexton said he considered it a great impertinence to try to pry into his affairs, and McHugh said that if Sexton put himself in the position of trying to conceal property, he would find himself the center of a pretty big scandal, to which Sexton answered that he didn't care to be put in any such position, and said, "To avoid anything of that kind, I will tell you what Father Butler gave me. He gave me $25,000." The witness testified that he had been in Sexton's employ ten years, and it apears from Sexton's testimony that Sexton sent him with Father Barth to Peckham to interview the latter, and take notes of his statements, and that he procured Peckham to make affidavit to the statements. This the witness, Jacobs, admits. If this witness was sitting within three or four feet of Sexton, on the occasion when McHugh and Egan visited Sexton's office, it seems extraordinary that McHugh did not see him. McHugh testified: "I have no recollection of anybody being present when I had the interview with Sexton in his office, except Sexton himself. There were no other people sitting close by, not very close to us. There was a person sitting toward the west wall of the room, ten or eleven feet away." The witness Jacobs does not claim to have heard all the conversation.

Thus far we have endeavored to state concisely the substance of such parts of the evidence as we think bear on the question of the alleged gift, and also such parts as counsel for appellant claim as bearing on it. If Sexton knew that McHugh was the attorney of the executor, and that a list of the bonds and their amount

were wanted, to be stated in the petition to the Probate Court, for probate of the will, and if he stated, on being asked for such list, that he had no claim, or made no claim, on the bonds, and would turn them over to the executor when he would be qualified, our conclusion would be that there was no gift as claimed. Such statements, made under such circumstances, by a sane man of affairs, as Sexton was, would be morally conclusive against any claim of ownership on the part of Sexton. The witnesses whose testimony bears on the question are Sexton and Egan, both interested witnesses, the former as claimant of the property, and the latter as residuary legatee under the will, McHugh, a reputable attorney having no interest in the result of the suit, and Jacobs, Sexton's employe, who acts as his private secretary and had been in his employ ten years. The learned judge would have been fully warranted, in considering the conflicting testimony of these witnesses, in finding that Sexton knew the purpose for which a list of the bonds and their amount was requested, that Sexton made the statements testified to by Egan and McHugh, and that there was no gift as claimed. We think such findings supported by the greater weight of credible evidence. In passing on the credibility of a witness it is important to consider whether his testimony is consistent with itself and other credible evidence in the case, and whether it is probable or the contrary.

Sexton's claim is that Dr. Butler gave him the property in question June 23, 1897. When he opened the box July 19, 1897, after Dr. Butler's death, he says he expected to find instructions in it. The following occurred in his examination in the Probate Court: Q. "Did you expect to find a letter of instructions from Dr. Butler in that box, after his death?" No answer. Q. "When you went to it after Dr. Butler's death"— Question continued and no answer. Q. "What did you expect?" A. "I expected instructions." Q. "As to what?" A. "As to what the

Doctor wished me to do." Q. "With what?" A. "Anything in the programme. I have never given the matter enough of thought to have that clear in my mind." Clearly, he expected to find instructions as to what he was to do with the contents of the box. Such expectation is radically inconsistent with the claim that the contents of the box were his absolutely. If the property were his, he needed no instructions. He claims that the Ireland note, which was also in the box, was his absolutely, yet he sought the advice of Egan and McHugh as to his right to destroy it under a written instruction to destroy certain correspondence, and was very much chagrined that they did not coincide with his view that it was included in the direction to destroy the correspondence. His endeavor to torture a direction to destroy correspondence into authority to destroy a promissory note for $5,000, evidencing consciousness that, without authority from Dr. Butler, he could not destroy the note, is utterly inconsistent with his claim of ownership. McHugh's testimony that Sexton promised to give him a list of the bonds, is corroborated by Sexton's evidence in the Probate Court. In the afternoon of the day when McHugh and Egan visited Sexton's office, McHugh went to Sexton's office and found him writing a letter. McHugh testified, as also did Sexton, that Sexton read to McHugh the part of the letter which had been written when McHugh reached the office, and Sexton testified that when McHugh arrived at the office he was making a list of securities. McHugh testified, and Sexton did not deny, that when he, McHugh, came in, Sexton said to him: "I have been writing you this letter, and I have to go to Cincinnati. I won't have time to finish it and copy it," and McHugh, who read what had been written, says he made a memorandum from it of the amount of the bonds, $29,000. The stenographic reporter, who reported Sexton's testimony in the Probate Court, testified to the correctness of the transcript of his stenographic report and the correctness

of the report. The transcript shows that Sexton testified in the Probate Court as follows: "He wanted to make me a present of the bonds which would come from Mr. Kenna, and he wanted, in case of his death, he wanted to make me a present of the contents of the box. I said something more, I have forgotten what it was; but I said, 'Very well, if you want it that way, very well.'" It is significant the words "in case of my death" were also used by Dr. Butler in March, 1897, when, as testified by Sexton, the Doctor contemplated the distribution to certain persons of the contents of the box after his death. The transcript also shows that Sexton's counsel, General Smith, asked Sexton, on cross-examination, the following question, to which Sexton answered as follows: Q. "Now, state fully what was said at what you call your final talk, and particularly if anything was said in reference to his instructions?" A. "Well, he said that he had made all his disposition; his will was completed, and that all his disposition was made, and that he had arranged matters as he desired to have them, and I would get from Mr. Kenna, by his order, $14,000, and he wanted to present me with the contents of the box, in the event of his dying." The competency of the reporter is not questioned; he testified positively to the correctness of his notes; did he make two mistakes, instead of "in contemplation of his death," setting down in one instance, the words, "in case of his death" and in another "in the event of his death?" We think this improbable.

As heretofore stated, Sexton, on cross-examination was forced to admit that his attorney, when preparing this case for trial, suggested to him that there must be a mistake as to the use of the words "in case of his death," and we think it a fair inference that it was suggested to him by some one, that the use of those words, in the connection in which he testified they were used, would be ineffective to constitute a valid gift *inter vivos*. The very words which Sexton says he

used to express his assent to the alleged gift savor of improbability. "I said, 'very well, if you want it that way, very well.'" These words seem to indicate that Dr. Butler, in a manner, forced a gift of $34,000 on a half-reluctant recipient. Dr. Butler executed his will June 23, 1897. In terms it purports to dispose of all his property. It has been probated, and it must be conclusively presumed that, at the time of the execution of the will, the testator's intention was as therein plainly expressed. Yet it is claimed that shortly after the execution of the will, and on the day of its execution, Dr. Butler changed his intention, and made a gift to Sexton, orally, of property which the will purports to dispose of, of the value of $34,000. To sustain this claim requires evidence strong, satisfactory and convincing, such as is not contained in the record before us. Our impression from the evidence is, that Sexton's claim of ownership was an afterthought, which probably occurred to him on his trip to Cincinnati, when he telegraphed to McHugh, "Treat all matters discussed as confidential until my return," and when he says he had "found the light." Our conclusion from the whole evidence is, that the finding of the facts by the learned judge of the trial court is sustained by the preponderance of credible evidence, and we do not think that the finding could reasonably have been other than it is.

In view of this conclusion we deem it unnecessary to refer to the numerous cases cited by counsel in respect to the elements which must co-exist to constitute a valid gift *inter vivos,* the necessity of delivery, what will or not be a sufficient delivery, etc.

Appellant's counsel contend that certain questions to Sexton, in respect to matters occurring before the death of Dr. Butler, were erroneously excluded by the court. As we understand the argument of counsel, it is that Sexton was called as a witness by the executor in the Probate Court; that the executor was an ad-

verse party within the meaning of section 2 of chapter 51 of the Revised Statutes, in relation to evidence, and that, by his being so called as a witness, he was rendered competent to testify in the present suit as to all material and relevant matters. Section 2 is as follows:

"No party to any civil action, suit or proceeding, or person directly interested in the event thereof, shall be allowed to testify therein of his own motion, or in his own behalf, by virtue of the foregoing section, when any adverse party sues or defends as the trustee or conservator of any idiot, habitual drunkard, lunatic or distracted person, or as the executor, administrator, heir, legatee or devisee of any deceased person, or as guardian or trustee of any such heir, legatee or de-visee, unless when called as a witness by such adverse party so suing or defending, and also except in the following cases, namely:

"First. In any such action, suit or proceeding, a party, or interested person, may testify to facts occurring after the death of such deceased person, or after the ward, heir, legatee or devisee shall have attained his or her majority." There are other exceptions which are inapplicable in the present case.

Sexton was examined in the Probate Court by virtue of section 81 of chapter 3 of the Revised Statutes, in regard to the administration of estates, which section is as follows:

"If any executor or administrator, or other person interested in any estate, shall state upon oath, to any County Court, that he believes that any person has in (his) possession, or has concealed or embezzled, any goods, chattels, moneys or effects, books of account, papers or any evidences of debt whatever, or titles to lands belonging to any deceased person; or that he believes that any person has any knowledge or information of or concerning any indebtedness or evidence of indebtedness, or property titles or effects, belonging to any deceased person, which knowledge or infor-

mation is necessary to the recovery of the same, by suit or otherwise, by the executor or administrator, of which the executor or administrator is ignorant, and that such person refuses to give to the executor or administrator such knowledge or information, the court shall require such person to. appear before it by citation, and may examine him on oath, and hear the testimony of such executor or administrator, and other evidence offered by either party, and make such order in the premises as the case may require.''

The language of section 2, chapter 51, is: ''No party to any civil action * * * shall be allowed to testify *therein* of his own motion, or in his own behalf * * * unless when called as a witness by such adverse party so suing or defending.'' By the section the prohibition against testifying refers expressly to the pending suit in which one sues or defends in one of the characters named in the section, by the use of the word ''therein,'' and the exception to the prohibition, ''unless when called as a witness,'' etc., is an exception to the prohibition, and the section is to be read as if the word ''therein'' (which is evidently understood) followed next after the word ''witness,'' so that the reading would be, ''unless when called as a witness therein,'' etc. The statute does not mean that if the party has been called by the ''adverse party so suing or defending'' in a previous suit or proceeding between the same parties, and in respect to the same matters, he may testify in the pending suit, and even though it should be thus construed it would, as we think, have no application to the present case. The proceeding under section 81 of the administration act is not a suit, nor is the executor necessarily a party to the proceeding. The information referred to in the section may be given to the court by an heir, legatee, devisee, administrator or creditor. The section provides that ''the court shall require such person to appear before it by citation, and may examine him on oath,'' etc. It is discretionary with the court whether

the party alleged to have property belonging to the estate shall be examined under oath (Wade v. Pritchard, 69 Ill. 279), but it is the court which calls him by citation and is to examine him, which, of course, the court may do by attorneys. The late (and I may very properly say much lamented) Judge Moran examined Sexton by permission of the court, and Sexton was represented by General Smith, since deceased, and Mr. A. M. Pence, both able and experienced members of the bar, who thoroughly cross-examined him in his own interest, which his evidence on that occasion sufficiently illustrates. Appellant's counsel object to the exclusion of other offered evidence, but we find no error in the rulings of the court in relation thereto.

Appellant's counsel submitted to the court certain propositions to be held as law in the case, which may be generally described as stating that if such and such were the facts, then the law was so and so, being favorable to the defendant. The court marked the propositions "Held," but found for the plaintiff, of which counsel for appellant complain as being inconsistent. We think the explanation obvious. The court found from the evidence that the facts were not as supposed in the propositions. The following appears from the record.

It is recited in the judgment that October 20, 1903, the cause was submitted to the court for decision, and that thereafter, on October 28, 1903, Sexton died; that November 21, 1903, appellee suggested to the court Sexton's death, and moved the court to enter judgment *nunc pro tunc* as of October 20, 1903, when the cause was submitted for decision, whereupon the court announced what the findings would be, and, on suggestion of the attorney who had represented Sexton, continued the cause till December 5, 1903, at which last date appellant appeared and showed to the court that Sexton died October 28, 1903, and that it had been appointed and had qualified as executor and trustee under the last will of Sexton, and moved to be substi-

tuted as defendant in the action, which motion the court then denied. Afterward, on the same day, December 5, 1903, the court entered judgment against Sexton *nunc pro tunc* as of October, 1903, for the sum of $34,378.52, after which appellant again moved to be substituted as defendant, which motion the court granted. We find no error in the action of the court in the premises. Seymour v. Richardson, 205 Ill. 77; Linn v. Brecher, 90 Ill. App. 6; 1 Black on Judgments, secs. 127, 202.

The question as to the ownership of the property in question has been decided against Sexton's claim three times: in the Probate Court, in the Circuit Court, on appeal from the Probate Court, and lastly in the case from which the judgment appealed from was rendered. An appeal was taken to this court from the judgment in the appeal to the Circuit Court from the Probate Court, and we find from examination of the record in that appeal that the appellee Egan confessed that the judgment appealed from was erroneous in its description of the bonds, but denied error in all other respects, on which confession the judgment was reversed, without decision on the merits.

The judgment is for the face value of the bonds and promissory note, with interest from date of demand, and it is not assigned as error that the damages are excessive. We are of opinion, from inspection of the entire record, that substantial justice has been done in the case, and that there is no error in the record warranting a reversal. Therefore the judgment will be affirmed.

*Affirmed.*